**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**Case No. 4:16-cr-00004-JHM**

**UNITED STATES OF AMERICA,**
**Plaintiff,**

**v.**

**KYLE WILLIAM RICH,**
**Defendant.**

FILED
JAMES J. VILT, JR. - CLERK
AUG 24 2026
U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

**DEFENDANT'S MOTION FOR REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. §3582(c)(1)(A)**

**COMES NOW**, Defendant, Kyle William Rich ("Rich"), proceeding *pro se*, and respectfully moves this Court for a reduction of his term of imprisonment pursuant to 18 U.S.C. §3582(c)(1)(A).

Rich requests that the Court reduce his controlling federal term from 180 months to 162 months. He does not request immediate release into society. His current projected release date is April 3, 2029. Assuming no other change in the Bureau of Prisons' computation, the requested eighteen-month reduction would move that date to approximately October 3, 2027. Rich would therefore remain in federal custody for more than one additional year before being transferred directly to the Kentucky Department of Corrections pursuant to its parole-violation detainer.

After that transfer, Rich will remain incarcerated while Kentucky resolves the approximately one year, six months, and three days remaining on his state sentence. The grant of this request will not extinguish his state obligation, release Rich into the community, or eliminate federal supervised release.

The requested relief would provide the narrowest available means of preserving the factual terms of a coordinated federal-state disposition negotiated by the United States with the Commonwealth's Attorney for Henderson County, Kentucky. Under that disposition, Rich agreed to plead guilty to all three federal counts and forfeit $8,262 and a 2005 black Mercedes to Kentucky. In return, Kentucky would file state charges equivalent to the federal charges and dismiss them, while the United States would agree to a below-

Guidelines sentence of 180 months running concurrently with the undischarged portion of Rich's previously imposed Kentucky sentence.

Rich accepted and fully performed the agreement. Kentucky filed and dismissed the contemplated state charges. Rich forfeited the currency and vehicle. The United States agreed to the 180-month disposition. The Presentence Investigation Report ("PSR"), Plea Agreement, and sentencing record all reflected that the federal sentence would run concurrently with the undischarged Kentucky term.

The promised concurrency has nevertheless failed in operation. Following Rich's sentencing in this Court, Kentucky maintained the parole violation as a detainer throughout his federal incarceration and now intends to require him to serve the remaining state term only after he completes the entire 180-month federal sentence. A sentence negotiated and imposed to operate concurrently has therefore become consecutive in practice.

The detainer has also increased the severity of Rich's federal confinement. It has prevented application of earned First Step Act ("FSA") time credits, obstructed prerelease placement, delayed access to programming assigned according to proximity to release, denied Rich an opportunity to obtain the Residential Drug Abuse Program incentive, increased his custody restrictions, and prevented transfer to a minimum-security camp.

Rich does not ask this Court to invalidate Kentucky's detainer, decide a freestanding state-law contract claim, or direct the Bureau of Prisons to make a particular placement decision. He asks this Court to exercise its express authority over the federal sentence and reduce it by eighteen months so that he can transfer to Kentucky custody approximately eighteen months earlier. That limited modification would preserve accountability, leave the remaining state sentence intact, prevent immediate community release, and restore the aggregate punishment as closely as now possible to the concurrent structure negotiated by the parties and adopted by this Court.

## I. PRELIMINARY STATEMENT

This motion arises from an unusual combination of post-sentencing circumstances.

Pre-sentencing, the United States did not negotiate Rich's federal plea in isolation. The federal prosecutor worked with the Commonwealth's Attorney for Henderson County, Kentucky, to develop a coordinated resolution of the related federal and state matters.

Rich did not negotiate separately with state authorities. The federal prosecutor communicated with the state prosecutor, worked out the coordinated disposition, communicated its terms to Rich, and presented that resolution as part of the consideration for Rich's federal guilty plea.

The agreement required performance by each participant. Rich would plead guilty to the three federal counts and agree to forfeiture of 8,262 and a 2005 black Mercedes to Kentucky. The state of Kentucky would file state charges equivalent to the federal offenses and then dismiss those charges after obtaining the agreed forfeiture. The United States would agree to a sentence of 180 months (a term below the applicable advisory Guidelines range) and would agree that the sentence will run concurrently with the undischarged portion of Rich's previously imposed Kentucky sentence.

The PSR documented these terms:

Paragraph 9 states:

> Pursuant to paragraph 9 of the plea agreement, the United States will agree that a sentence of 180 months imprisonment, to run concurrently with the undischarged portion of any previously imposed sentence in the Commonwealth of Kentucky, is the appropriate disposition in this case.

PSR ⁋9.

Paragraph 12 states:

> The United States will demand forfeiture of the firearm listed in the notice of forfeiture. Further, the defendant agrees to execute an agreement whereby the defendant agrees to the forfeiture, by the Commonwealth of Kentucky, the City of Henderson, and/or the Commonwealth's Attorney for Henderson County, Kentucky, $8,262 in U.S. currency and a 2005 Black Mercedes vehicle, seized by law enforcement on or about May 4, 2015.

PSR ⁋12

The PSR calculated a total offense level of 34 and a criminal-history category of VI, producing an advisory imprisonment range of 262 to 327 months. PSR ⁋ 95. The negotiated 180-month term was therefore 82 months below the bottom and 147 months below the top of the advisory range.

The eighteen-month reduction now requested would not alter the essential severity of that sentence. Even after the reduction, Rich's 162-month term would remain lengthy and would be followed by transfer to Kentucky custody.

The PSR also specifically addressed the unresolved state term:

> The defendant has a pending parole revocation according [to] the Kentucky Department of Corrections, Division of Probation and Parole and has an anticipated state term of imprisonment. Pursuant to Section 5G1.3(d), the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutive to the anticipated undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

PSR ¶ 96.

This Court selected concurrency as the reasonable punishment. At sentencing on June 12, 2017, the Court adopted the agreed 180-month disposition and the concurrent relationship in the Plea Agreement and PSR. (*See* D.E. 25-26).

The federal and state events unfolded in conformity with the coordinated agreement. Kentucky filed and dismissed the contemplated charges. Rich surrendered the currency and vehicle. The United States agreed to the 180-month disposition. The Court imposed that term and adopted concurrency with the undischarged Kentucky sentence.

The agreement therefore existed not merely as Rich's subjective expectation but as a documented, coordinated disposition substantially performed by all participants.

The concurrency provision, however, has not produced its promised effect. Post-sentencing, Kentucky instead maintained the parole violation as an unresolved detainer. It now intends to return Rich to state custody only after he completes his entire federal sentence and require him to serve approximately one year, six months, and three days.

The result can be characterized as a breach, an inability to perform, or a post-sentencing frustration of the coordinated disposition. Under any characterization, the practical injury is the same: Rich surrendered constitutional rights and valuable property in exchange for a concurrent federal-state custodial structure that he is not receiving.

The Court need not find that any federal or state official acted with subjective bad faith. It is sufficient that the record establishes the agreement, Rich's reliance and performance, the Court's adoption of concurrency, and the present failure of that material term.

Rich does not seek withdrawal of his plea or vacation of his convictions. He seeks the narrower remedy of an 18-month reduction so that he may transfer to Kentucky custody and serve the remaining state term during the period that would otherwise constitute the final 18 months of his federal sentence.

This would not produce literal overlap after the federal sentence ends. It would, however, prevent the entire 180-month federal sentence and the entire remaining Kentucky term from operating consecutively, thereby restoring the aggregate punishment as closely as is presently possible to the concurrent structure selected by this Court.

## II. PROCEDURAL AND FACTUAL HISTORY

### A. The indictment and arraignment

On January 13, 2016, a federal grand jury returned a three-count indictment against Rich. (D.E. 1).

Count One charged conspiracy to knowingly and intentionally possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§846, 841(a)(1), and 841(b)(1)(A)(viii).

Count Two charged knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii).

Count Three charged Rich, having previously been convicted of a felony, with possessing a firearm, in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2).

Rich was arrested in the Middle District of Florida on September 20, 2016. After transfer to this District, he was arraigned on all three counts on October 3, 2016. (D.E. 9-12).

### B. The guilty plea and coordinated disposition

On March 9, 2017, Rich pleaded guilty to all three counts pursuant to a written Plea Agreement and sealed Supplemental Plea Agreement. (D.E. 17-18).

By pleading guilty, Rich accepted responsibility for his conduct and spared the government, witnesses, and public the burden and expense of trial.

The Plea Agreement contained the agreed 180-month disposition and the United States' agreement that the sentence will run concurrently with the undischarged portion of any previously imposed Kentucky sentence.

The coordinated disposition also required Rich to execute an agreement forfeiting $8,262 and a 2005 black Mercedes to Kentucky, the City of Henderson, and/or the Commonwealth's Attorney for Henderson County.[1] (PSR ⁋).

Rich fully performed these obligations.

### C. The PSR and advisory Guidelines range

The final PSR was filed on June 1, 2017. (D.E. 23). It calculated a total offense level of 34 and a criminal-history category of VI. That calculation produced an advisory imprisonment range of 262 to 327 months. (PSR ⁋ 95).

The agreed 180-month sentence was below that range. It was 82 months below the 262-month bottom and 147 months below the 327-month top.

The agreed disposition nevertheless remained severe. A 180-month term equals fifteen years of federal imprisonment before application of lawful credits.

The PSR also documented the pending Kentucky parole revocation and anticipated state imprisonment. It explained that, under U.S.S.G. §5G1.3(d), the Court could impose the federal sentence concurrently, partially concurrently, or consecutively to achieve a reasonable punishment. (PSR ⁋ 96).

### D. The June 12, 2017, sentencing and judgment

On June 12, 2017, Chief Judge Joseph H. McKinley, Jr. sentenced Rich. (D.E. 25). On Counts One and Two, the Court imposed concurrent terms of 180 months' imprisonment and concurrent five-year terms of

[1] Rich's underlying Kentucky cases: No. 04-F-00491, cross-referenced as Case No. 04-CR-00355, and Case No. 09-CR-00100. In Case No. 04-CR-00355, Rich received a five-year sentence. In Case No. 09-CR-00100, he received a six-year sentence. Rich served five years, three months, and nine days before being released on parole. After application of Kentucky's sentence calculations and credits, his Kentucky Resident Record Card reflects one year, six months, and three days of Department of Corrections time remaining. (*See* **Exhibit 1**, Kentucky Resident Record Card)

supervised release. On Count Three, the Court imposed a concurrent term of 120 months' imprisonment and a concurrent three-year term of supervised release.

The controlling federal term was therefore 180 months, followed by five years of supervised release. The Court also imposed a total special assessment of $300, representing $100 for each of the three counts of conviction. (D.E. 26). Beyond this, the Court imposed no fine and no restitution.

Rich has paid the $300 special assessment in full. He has no remaining fine, restitution, or special-assessment balance.

Consistent with the Plea Agreement and PSR, the Court adopted the agreed concurrent treatment of the undischarged Kentucky term. (*See* Plea Agreement ⁋ 9; PSR ⁋⁋9, 96).

**E. The forfeiture proceedings**

On March 30, 2017, the United States moved for a preliminary order of forfeiture concerning the property subject to federal forfeiture. (D.E. 20).

The Court entered the preliminary order on April 25, 2017. (D.E. 21).

On November 15, 2017, the Court entered the Final Decree and Order of Forfeiture. (D.E. 31-32).

The federal forfeiture proceedings were separate from, but consistent with, the broader coordinated disposition described in PSR ⁋ 12, under which Rich also surrendered the funds and vehicle to Kentucky authorities.

**F. Rich's prior request under §3582(c)(2)**

Rich previously sought relief associated with 18 U.S.C. §3582(c)(2) and the two criminal-history points assessed under former U.S.S.G. §4A1.1(d) for committing the federal offenses while under a criminal-justice sentence of parole supervision. (*See* D.E. 38).

On February 22, 2024, the Court denied the requested relief under §3582(c)(2). (D.E. 39).

That request was based on a different statutory subsection, a different Guidelines issue, and a different legal theory. It did not present or adjudicate the present claim under §3582(c)(1)(A), the failure of the coordinated concurrent-sentence structure, the effects of the Kentucky detainer, the present FSA credit circumstances, or Rich's expanded rehabilitation record.

This motion therefore does not duplicate the prior request.

### G. Kentucky's handling of the parole matter

After sentencing, Kentucky did not bring Rich back during his federal term to resolve the parole violation or otherwise implement the concurrent structure. Instead, on June 27, 2017, 15 days after Rich's sentencing, the Kentucky Parole Board rescinded its previous warrant for absconding from supervision and reissued a new warrant for a new felony conviction. This is an event about which Rich learned in May of 2020 after he received a response from the Kentucky Department of Corrections ("DOC") to one of Rich's attempts to inquire about the status of the state case. (*See* **Exhibit 2**, May 1, 2020, DOC Response Letter).

In the DOC's May response and again in a later response to Rich's official attempts to resolve the state detainer issue, on January 30, 2025, the DOC states: "You will be extradited back to Kentucky upon completion of your Federal sentence," and "...once you have completed your federal sentence, you will be extradited back to the Kentucky Department of Corrections, where a final hearing before the Kentucky parole board will be scheduled," respectively. In the January response, the DOC establishes that, per state statutes, Rich "must be returned to prison..." and his "parole violation shall not be permitted to run concurrently with" his federal term. (*See* **Exhibit 3**, January 30, 2025, DOC Response Letter).

### H. Current projected release and requested modification

The BOP presently lists Rich's projected release date as April 3, 2029. (*See* **Exhibit 4**, Sentence Monitoring Computation Data Sheet). Rich requests an 18-month reduction, from 180 months to 162 months. If all other aspects of the BOP calculation remain unchanged, this reduction would move his projected federal release date to approximately October 3, 2027.

The reduction would not cause immediate release. Rich would remain in federal custody until the reduced term expires. Upon expiration, the Kentucky detainer would require his direct transfer to state custody, where he would remain incarcerated while Kentucky resolves the parole matter and approximately eighteen months of remaining state time.

## III. RICH HAS SATISFIED §3582(c)(1)(A)'S ADMINISTRATIVE REQUIREMENT

The Court "may not modify a term of imprisonment" on a defendant's motion until the defendant has fully exhausted the available administrative remedies or thirty days have elapsed from the warden's receipt of the compassionate-release request, whichever occurs first. 18 U.S.C. §3582(c)(1)(A). *See also United States v. Alam*, 960 F.3d 831 (6th Cir. 2020) (quoting 18 U.S.C. §3582(c)).

Rich submitted his request for compassionate release to Warden Mendoza on June 29, 2026, through Case Manager Felton in accordance with facility procedures. (*See* **Exhibit 5**, Request for Compassionate Release, Signed and Dated by Case Manager (when he scanned and emailed the request packet to the warden)). The request presented the same principal grounds, et alia, raised here. Warden Mendoza denied the request on July 12, 2026. (*See* **Exhibit 6**, Warden's Denial)[2]

More than 30 days have elapsed since the Warden received the request. In *United States v. Alam*, the Sixth Circuit held that §3582(c)(1)(A)'s administrative requirement is a mandatory claim-processing rule when the government timely invokes it, but not a jurisdictional restriction. 960 at 833-36 (6th Cir. 2020). As held in *United States v. Kelly*: "Following *Alam*, a motion for compassionate [release] will be ripe in either of the following circumstances: (1) if an incarcerated person receives a denial and is able to fully exhaust all of h[is] administrative remedies ***before*** the 30-day waiting period has elapsed; or (2) whenever an incarcerated person waits 30 days from the date []he submitted h[is] request to the warden, regardless of whether the warden responds." No. 2:15-cr-00247, 2020 U.S. Dist. LEXIS 224928, 2020 WL 7046960, at *3 (S.D. Ohio Dec. 1, 2020) (emphasis in original).

Because more than 30 days have elapsed since June 29, 2026,[3] Rich has satisfied the statutory requirement.

## IV. GOVERNING LEGAL STANDARD

A term of imprisonment ordinarily constitutes a final judgment that a district court may modify only when Congress has expressly authorized modification. 18 U.S.C. §3582(b)-(c). Compassionate release is a

---

[2] Per the denial, it's dated the 12th. The Warden signed the denial on the 14th. In either case, more than 30 days has passed.

[3] Rich handed the Warden Request to his Case Manager on June 29, 2026. In response to such submissions, unit team staff typically don't submit the filing to the Warden until the next day. Anticipating this, in an overabundance of caution, Rich dated the filing for the following day, June 30, 2026. But in this case, his unit team submitted it right away, on the 29th.

concept that has come to be recognized as authorized by Congress in section 3582(c)(1)(A). It is an exception to the "rule of finality," which prohibits district courts from modifying a sentence "except in limited circumstances." *United States v. Hunter*, 12 F.4th 555, 561, 569 (6th Cir. 2021). Also, "§3582(c)(1)(A)'s text and structure, together with its narrow scope, show that identifying 'extraordinary and compelling reasons' is a task that focuses on post-sentencing factual developments." *Id.* at 569.

The defendant bears the burden of establishing entitlement to a reduction. *See United States v. Karr*, No. 6:17-cr-25-REW, 611 F.Supp.3d 395, 2020 WL 774363, at *6 (E.D. Ky. Feb. 18, 2020). For him to do so, there are three requirements that must be satisfied before relief can be granted under this section, the first of which is that "extraordinary and compelling reasons warrant [a sentence] reduction." *United States v. Elias*, 984 F.3d 516, 518 (6th Cir. 2021) (quoting 18 U.S.C. §3582(C)(1)(a)). For the second requirement, the Court must "ensure 'that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Nicholson*, No. 21-1724, 2023 U.S. App. LEXIS 17818, 2023 WL 4447881, at *2 (6th Cir. July 11, 2023) (quoting 18 U.S.C. §3582(c)(1)(A)). Finally, the Court must '"consider[] the factors set forth in [18 U.S.C. §3553(a)] to the extent that they are applicable.'" Ibid.

The applicable policy statement is U.S.S.G. §1B1.13. Section 1B1.13(b)(5) recognizes an extraordinary and compelling reason where:

> The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

*Id.*

The Commission required similarity in gravity, not identity in type. There is no single, universally-fixed legal definition of "gravity" in §1B1.13(b)(5). This reflects a deliberate choice by the Commission to preserve judicial flexibility rather than create a rigid test. Courts accordingly apply the "ordinary meaning" of the term. *Simon v. Ivey*, 2025 U.S. Dist. LEXIS 156581 (N.D. Ala. Aug. 13, 2025) (finding for "the ordinary meaning" of the phrase used in a statute by Congress). The ordinary meaning of "gravity" is: the seriousness, weight, or significance of the circumstances. And courts may find extraordinary and compelling reasons where individually insufficient circumstances, in the aggregate, rise to a level of combined gravity comparable to those specified in §1B1.13(b)(1)-(4). *See United States v. Snype*, 683 F. Supp. 3d 351, 364

(S.D.N.Y. 2023) (finding extraordinary and compelling reasons where "none of the circumstances…would alone permit a sentence reduction" but their "confluence" collectively met the requisite standard). Other circuits are in agreement. *United States v. Trenkler*, 47 F.4th 42, 49 (1st Cir. 2022) ("[T]he whole may be greater than the sum of its parts, and reasons that might not do the trick on their own may combine to constitute circumstances that warrant a finding that the reasons proposed are, in the aggregate, extraordinary and compelling.")

Further, rehabilitation alone cannot constitute an extraordinary and compelling reason. 28 U.S.C. §994(t). Rehabilitation may, however, be considered with another qualifying circumstance and in determining whether and to what extent a reduction is warranted. U.S.S.G. §1B1.13(d).

Rich recognizes the limitations imposed by Sixth Circuit precedent, such as: Facts known and fully considered at sentencing ordinarily cannot simply be relabeled as extraordinary and compelling years later. *Hunter*, at 569-72 (6th Cir. 2021). Also, nonretroactive changes in sentencing law do not independently establish extraordinary and compelling reason. *United States v. McCall*, 56 F.4th 1048, 1065-66 (6th Cir. 2022) (en banc); *United States v. Bricker*, 135 F.4th 427, 435-38 (6th Cir. 2025). And recently, in *United States v. Hall*, the Sixth Circuit rejected a sentence reduction resting on the defendant's youth at the time of the offense and later rehabilitation. No. 24-6094, slip op. (6th Cir. June 25, 2026) (citing *Hunter* and *Bricker*, supra).

Rich does not rely on youth, rehabilitation alone, a nonretroactive change in law, or disagreement with the original sentence. His principal circumstance is the post-sentencing failure of a documented and material concurrent-sentence structure that formed part of a coordinated federal-state disposition. That failure has exposed Rich to approximately eighteen additional months of sequential imprisonment and has imposed years of detainer-related restrictions during his federal custody. This circumstance is "most unusual, far from common, and having little or no precedent," *McCall*, at 1055 (internal quotations omitted).

Rich's circumstances exist independently of his rehabilitation. His post-sentencing conduct bears on whether the Court should exercise its discretion, whether the requested reduction is consistent with §3553(a), whether he presents a danger, and whether eighteen months is an appropriate and proportionate reduction.

## V. EXTRAORDINARY AND COMPELLING REASONS WARRANT A LIMITED REDUCTION

### A. The coordinated federal-state disposition contained a material concurrency term

Plea agreements are contractual in nature and must be enforced according to their terms. *United States v. Ligon*, 937 F.3d 714, 718-21 (6th Cir. 2019). In *Santobello v. New York*, the Supreme Court held that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

The Government negotiated a plea agreement with Rich under Federal Rule of Criminal Procedure 11(c)(1)(C). That rule authorizes the Government to enter plea agreements with a recommended sentence or sentencing range. Fed. R. Crim. P. 11(c)(1)(C). If a district court accepts a Rule 11(c)(1)(C) agreement, the sentencing "recommendation or request binds the court." *Id.* When the parties submitted the proposed agreement to the Court, "the district court ha[d] three choices": accept the agreement, reject it, or reserve its decision until it reviewed Rich's PSR. *Hughes v. United States*, 584 U.S. 675, 682 (2018) (citing Fed. R. Crim. P. 11(c)(3)(A)). Further, the prosecution is held only to the literal terms of the plea agreement. *See United States v. Packwood*, 848 F.2d 1009, 1012 (9th Cir. 1988). In determining the scope of a plea agreement, the content of the promises made is a question of fact. *United States v. Lukse*, 286 F.3d 906, 909 (6th Cir. 2002); *United States v. Doe*, 940 F.2d 199, 202 (7th Cir. 1991).

The United States directly agreed that "a sentence of 180 months imprisonment, to run concurrently with the undischarged portion of any previously imposed sentence in the Commonwealth of Kentucky," was the appropriate disposition. PSR ⁋ 9. The PSR separately identified the pending parole revocation and anticipated state term, advised that §5G1.3(d) permitted concurrent, partially concurrent, or consecutive treatment, and framed the selection as necessary to achieve a reasonable punishment. PSR ⁋ 96. The Court adopted the agreed 180-month sentence and selected concurrency.

The concurrency provision had an obvious and substantial effect on the total imprisonment Rich reasonably expected to serve. A 180-month federal sentence overlapping with an eighteen-month state balance is materially different from a 180-month federal sentence followed by the entire eighteen-month state balance.

### B. The agreement was coordinated by the United States with Kentucky authorities

Rich did not independently negotiate with Kentucky and then ask the federal government to accommodate a separate understanding. The federal prosecutor communicated and worked directly with Kentucky's prosecuting authority. The federal prosecutor communicated the combined disposition to Rich and presented it as the basis on which Rich would plead guilty and forfeit his property.

The objective sequence of events that followed confirms the coordinated agreement:

1. Kentucky filed state charges equivalent to the federal charges.
2. Kentucky dismissed those charges as contemplated.
3. Rich surrendered the $8,262 and the 2005 black Mercedes.
4. The United States agreed to the 180-months term and concurrency.
5. The Court imposed the agreed sentence.

These coordinated events demonstrate that the state dismissal, forfeiture, federal sentence, and concurrency provision formed related components of one negotiated resolution.

### C. Rich fully performed his obligations

Rich pleaded guilty to all three counts and surrendered his right to trial. He accepted responsibility and spared the Government and public the burdens of trial. He executed the required forfeiture and surrendered the currency and vehicle to Kentucky. He accepted and began serving the 180-month federal sentence.

Rich has now served more than ten years in custody. The federal and state authorities received the material benefits for which they bargained. But Rich has not received the practical benefit of the material concurrency term.

### D. The 180-month sentence and concurrency provision must be considered together

The agreed 180-month term was 82 months below the bottom and 147 months below the top of the advisory Guidelines range. The Government may argue that the below-Guidelines term itself supplied Rich with the full benefit of his bargain. But that reading would separate provisions that the record treated as parts of one agreed disposition.

The Presentence Investigation Report, at paragraph 9, did not describe the appropriate disposition merely as "180 months." It described it as "180 months imprisonment, to run concurrently with the

undischarged portion" of the Kentucky sentence. The length and relationship of the sentence were both material terms of the punishment, particularly selected by both the Government and Court.

Preserving the 180-month term while allowing the concurrency provision to fail changes the agreed aggregate punishment. Comparatively, if "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 595, 169 L. Ed.2d 445 (2007), then equivalent consecutive time spent in a custodial environment (18 months and 18 months) is more severe than equivalent concurrent time (18 months).

**E. Kentucky's handling of the parole matter defeated the concurrent structure**

The purpose of the compassionate release statute "was to give courts a means to shorten sentences that had been rendered unjust by *post*-sentencing developments." *United States v. Logan*, 532 F. Supp. 3d 725, 731 (D. Minn. 2021) (emphasis in original). The Sixth Circuit has made clear that "defendants seeking compassionate release must show that their post-sentencing 'personal circumstances' have 'changed so that the district court should weigh the §3553(a) factors differently than it had at the original sentencing.'" *Hunter*, at 570 (quoting *United States v. Navarro*, 986 F.3d 668, 672 (6th Cir. 2021)). *See also United States v. Parks*, No. 24-5566, 2025 U.S. App. LEXIS 8525, 2025 WL 1069308, at *2 (6th Cir. Apr. 9, 2025) (finding that "extraordinary and compelling reasons focus 'on post-sentencing factual developments.'") (citation omitted).

Post sentencing, Kentucky did not resolve the parole violation during the federal term in a manner that permitted the contemplated overlap. In response to the state's delay, Rich filed multiple times to the Justice and Public Safety Cabinet, Kentucky Parole Board, in an effort to resolve the pending violation of parole charge and preserve the agreed-upon concurrency sentence. Despite these filings, the Board maintained the parole violation as an unresolved detainer.

Kentucky now intends to take custody only after Rich completes the entire federal term and require him to serve approximately one year, six months, and three days. (Exhibits 1-3). This produces consecutive rather than concurrent punishment.

This failure may reflect Kentucky's position that its revised governing statutes required consecutive service, a later decision not to implement the agreement, or an intergovernment misunderstanding concerning how concurrency would operate. But Rich need not establish subjective misconduct to demonstrate the

extraordinary consequence. Respectively, if Kentucky lacked legal authority to implement the concurrency term when the federal prosecutor communicated it, Rich relied on a material promise that could not be performed. If Kentucky possessed a lawful means to implement the term, but later declined to do so, Rich lost the promised benefit after fully performing his obligations. Under either characterization, the aggregate sentence now being executed materially differs from the coordinated disposition presented to Rich and adopted by the Court.

### F. Rich seeks a limited federal remedy rather than a collateral attack

Rich does not seek withdrawal of the guilty plea or vacation of his convictions. He does not ask the Court to determine that the original judgment was unlawful when entered.

The Court imposed the agreed sentence and adopted concurrency. The present injury developed through the manner in which the state matter was administered afterward.

Rich also does not ask this Court to order Kentucky to dismiss the detainer, calculate the state sentence differently, or refrain from exercising lawful parole authority. He asks the Court to modify only the remaining federal term.

Reducing the federal sentence by eighteen months would allow Kentucky, at the conclusion of Rich's federal term, to execute its detainer and the remaining state sentence. It would not interfere with Kentucky's authority.

In this way, the reduction would prevent the full 180-month federal term and the entire remaining state term from operating consecutively, restoring the total custodial structure as closely as possible to the coordinated disposition.

### G. The unfulfilled concurrency term presents an individualized loss of liberty

The circumstance is not a generalized objection to plea bargaining or sentence administration. It is a specific, documented, and measurable loss. Rich surrendered constitutional rights and valuable property based on a coordinated disposition that included concurrency. The federal and state authorities substantially completed the portions of the agreement benefiting them. Rich now faces approximately eighteen additional months of imprisonment because the concurrency provision has failed in operation. The requested reduction

corresponds directly to that documented remaining state balance. It is therefore proportional to the principal injury and substantially narrower than the total detainer-related consequences Rich has experienced (as outlined below in section VI. of this brief).

### H. *Hall* does not foreclose this motion

As covered earlier, *Hall*[4] rejected youth and rehabilitation as extraordinary and compelling reasons. Rich's motion does not combine rehabilitation with another ordinary personal circumstance. The principal circumstance, instead, is the post-sentencing failure of a material concurrent-sentence arrangement, resulting in additional sequential imprisonment and years of detainer-related restrictions.

Also, Rich's rehabilitation did not create the agreement, the failure of concurrency, the additional Kentucky term, or the detainer's effects. Those circumstances exist independently.

Rehabilitation becomes relevant only after the Court determines that the failure of the coordinated disposition and its consequences satisfy §1B1.13(b)(5).

## VI. THE DETAINER HAS MATERIALLY INCREASED THE SEVERITY OF RICH'S FEDERAL INCARCERATION

### A. The detainer has prevented application of earned First Step Act time credits

An eligible prisoner who successfully participates in evidence-based recidivism reduction ("EBRR") programs or productive activities ("PA") earns ten days of time credits for every thirty days of successful participation. 18 U.S.C. §3632(d)(4)(A)(i). A qualifying prisoner assessed at Minimum or Low risk who has not increased in risk over two consecutive assessments earns an additional five days for every thirty days of successful participation. *Id.* §3632(d)(4)(A)(ii). The statute provides that prisoners who successfully participate in EBRR programs are entitled to receive credit toward early release or pre-release custody. 18 U.S.C. §§3624(g), 3632(d)(4).

Rich has consistently participated in qualifying programs and PAs. His BOP records reflect 365 days available toward early release and 545 additional days toward RRC or home-confinement placement. (*See* **Exhibit 7**, FSA Time Credit Assessment, Pg. 1). These records also show that the credits have not advanced

---

[4] *United States v. Hall,* No. 24-6094, slip op. (6th Cir. June 25, 2026)

his conditional release prerelease date. This was primarily because of the Kentucky detainer, which kept his recidivism risk level inflated and, despite statute and policy, is still being used by the BOP to refuse application of earned credits even when at a low level for recidivism. (*See* **Exhibit 8**, FSA Time Credit Assessment, Pg. 4). The following is provided more for legal context as it relates to the issue at hand, not for the argument of the thing itself, which would be inappropriate for a motion for compassionate reduction of sentence.

(i) Congress did not make a parole-violation detainer a disqualification from application of First Step act Time Credits ("FTCs").

Congress directed that FTCs earned through successful participation "shall be applied toward time in prerelease custody or supervised release" and that the BOP "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. §3632(d)(4)(C). Congress then identified the convictions that make a prisoner ineligible to earn FTCs. *Id.* §3632(d)(4)(D). It separately prohibited application where a prisoner is subject to a final order of removal. *Id.* §3632(d)(4)(E). Neither provision identifies a state parole-violation detainer as a disqualification.

Section 3624(g) likewise specifies the requirements for application: sufficient earned credits, the required risk reduction or risk level, a properly computed remaining sentence, and the applicable PATTERN or warden-approval requirements. It contains no detainer exclusion.

Accordingly, the existence of the Kentucky state parole detainer does not, standing alone, permit BOP to refuse to calculate or apply Rich's FTCs.

(ii) BOP rescinded its former categorical all-detainer restriction

The original version of Program Statement 5410.01 stated that inmates with unresolved charges or detainers could earn FTCs but could not apply them until the matter was resolved. It also conditioned automatic application toward early supervised release on the absence of any detainer. But on February 6, 2023, the BOP issued Change Notice CN-1 and struck both provisions. On March 10, 2023, the BOP issued CN-2 and directed that, when the applicable requirements are met, earned credits "must be applied." The current regulation, 28 C.F.R. §523.44, contains no parole-detainer exclusion.

The BOP, though, has relied on, and will continue to rely on the deleted detainer restriction. Whether it does so through a local institutional practice, a SENTRY code, or the 1998 CCC policy, the practice conflicts with §3632(d)(4)(C), §3624(g), §523.44, and current Program Statement 5410.01 CN-2.

Rich does not ask this Court to calculate or directly award FTCs. He presents the nonapplication as evidence of how the detainer has altered the sentence he has actually served.

### B. The detainer caused a permanent loss of enhanced credit opportunities

From December 21, 2018, through December 28, 2022, Rich was assessed as High risk. On December 28, 2022, the BOP reduced his assessment to Medium. He remained Medium until June 15, 2025, when the BOP reduced his classification to Low.[5] (*See* **Exhibit 9**, FSA Time Credit Assessment, Pg. 3).

The unresolved detainer affected Rich's classification, custody, and eligibility treatment. During his High- and initial Medium-risk periods, Rich earned ten days for each thirty days of successful participation rather than the fifteen-day rate available to a qualifying Minimum- or Low-risk prisoner. Over the relevant period, the five-day difference accumulated to approximately thirteen months of enhanced credits that were never awarded.

Unlike already earned credits that remain unapplied, those additional five-day increments cannot be recovered retroactively. This consequence demonstrates that the detainer contributed to both a continuing loss (through nonapplication) and a permanent loss (through reduced earning opportunities).

### C. The detainer has obstructed prerelease placement

"The Second Chance Act of 2007 …increases a federal prisoner's eligibility for pre-release placement in a halfway house from 6 to 12 months, and requires the Bureau of Prisons (BOP) to make an individual determination that ensures that the placement is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" *Vasquez v. Strada*, 684 F.3d 431, 432-33 (3d Cir. 2012) (quoting 18 U.S.C. §3624(c)(6)(C)).

---

[5] He remained Low until June 10, 2026, when the BOP increased his classification back to Medium in response to a minor-severity incident report he received on August 25, 2025. (Exhibit 9)

Rich's Case Manager, Mr. Felton,[6] advised him that without the Kentucky detainer he would qualify for a twelve-month RRC placement. The detainer has prevented that placement. More to the point, the sentence this Court handed down is not the same sentence currently being served by Rich. (*See* Footnote 12, pg. 29 of this brief.)

Rich does not ask the Court to guarantee a particular placement duration. The lost opportunity demonstrates that the sentence he is serving lacks a transitional component that the BOP otherwise determined would be appropriate. Instead of progressing from institutional confinement to structured community custody, Rich remains in a federal institution until eventual transfer to another prison system.

### D. The detainer prevented Rich from qualifying for the RDAP incentive

Rich completed the forty-hour Drug Education Program and the 500-hour Non-Residential Drug Abuse Program ("NRDAP"). These programs helped him understand addiction, identify triggers, establish accountability, and develop tools for maintaining sobriety. Rich sought to build on that progress through the Residential Drug Abuse Program ("RDAP").

Successful completion of RDAP may result in a sentence reduction of up to one year for an eligible prisoner. 18 U.S.C. §3621(e)(2)(B). The unresolved detainer prevented Rich from qualifying for (due to its prevention of) completing the necessary community-based components required on the backend of the program when the participant transitions to RRC housing. This portion of the program is referred to as TDAT. In other words, he would not be able to finish the program, causing him to lose the opportunity to obtain the RDAP incentive.

Rich does not characterize the incentive as an automatic one-year entitlement. He presents it as another documented opportunity made unavailable by the detainer.

### E. The detainer has delayed assigned programming

The BOP's Individualized Needs Plan identifies trauma-focused psychological programming as an assigned need. (*See* **Exhibit 10**, Individualized Needs Plan). Rich has repeatedly attempted to enroll. But the

---

[6] Since this conversation occurred, Mr. Felton has moved to FCC Coleman (Camp), trading places with Case Manager Ms. McGregor.

Psychology Department prioritizes enrollment according to proximity to prerelease. Because the detainer prevents application of earned credits and produces a more distant prerelease date, Rich has remained on the waiting list since February 2022. (*See* **Exhibit 11**, Psychology Department Correspondence).[7] His continued attempts to enroll demonstrate his commitment to rehabilitation. His inability to obtain the programming demonstrates the detainer's continuing effect on reentry preparation.

### F. The detainer has increased Rich's custody restrictions

Under BOP classification policy, a parole-violation detainer affects security and custody scoring. When the pending matter involves a parole violation, the BOP may rely on the most serious documented conduct underlying the original offense in assigning points. *See* BOP PS 5100.08. Consequently, much of the time Rich served at medium-security level facilities, without the detainer he would have served in low security.

Now, while in low security, Rich's unit team advised him that, without the detainer, based on his conduct, risk classification, and programming record, his custody score would support transfer to a minimum-security camp.[8] With the detainer, that transfer is foreclosed.

The detainer has therefore made Rich's federal incarceration more restrictive throughout its duration.

### G. The detainer prolonged Rich's exposure to overcrowded conditions

Rich is housed at FCI Coleman Low. The facility was designed for approximately 1,536 incarcerated people. One of its twelve housing units has been closed because of black mold and construction problems, reducing usable capacity to approximately 1,408. The remaining units nevertheless house nearly 1,800 people.

BOP PS 1060.11 provides that cubicles measuring 120 square feet or less should not house more than two people. At Coleman Low, thirty-six of the sixty-four cubicles in each unit (~56%) house three people despite falling below that threshold. Units designed for approximately 128 people instead house more than 160.

[7] Rich also remains on waiting lists for Criminal Thinking, Anger Management, Academic Success, and ServSafe.
[8] Camp placement carries different security restrictions, movement rules, work opportunities, and reentry preparation.

Overcrowding does not independently establish an extraordinary and compelling reason for relief, and it's not being provided here as such. It's only provided to demonstrate the actual severity of the additional institutional time caused by the detainer's prevention of camp placement and the application of earned credits toward prerelease custody.

### H. The recognized consequences of detainers correspond to Rich's experience

In *Carchman v. Nash*, the Supreme Court held that the Interstate Agreement on Detainers ("IAD") did not cover probation-violation detainers. 473 U.S. 716, 725-34 (1985). The holding, though, does not erase the practical harms associated with unresolved detainers.

Justice Brennan's dissent, joined by Justices Marshall and Stevens, explained that detainers can prevent concurrent sentencing, increase custody classifications, block institutional transfers, interfere with work and treatment opportunities, and obstruct rehabilitation through uncertainty about the actual duration of confinement. *Id.* at 734-47 (Brennan, J., dissenting).

Rich has experienced these consequences and more. The detainer has defeated the intended concurrency, increased custody restrictions, prevented camp placement, blocked programming, obstructed prerelease custody, prevented application of earned credits, and garnered an additional state term for the end of the federal sentence.

## VII. RICH'S REHABILITATION SUPPORTS THE REQUESTED REDUCTION

While rehabilitation alone cannot constitute an extraordinary and compelling reason, 28 U.S.C. §994(t), it is a factor the Court may consider as part of a multi-factor §1B1.13(b)(5) analysis. Amendment 814 incorporated rehabilitation as a component of the catch-all category when combined with other qualifying circumstances. U.S.S.G. §1B1.13(d).

Rehabilitation is demonstrated not by word but by conduct; specifically, by sustained prosocial behavior and concrete steps toward reentry. The psychological literature supports a meaningful distinction between guilt and shame as predictors of rehabilitative outcome. Research consistently finds that guilt, unlike shame, is associated with constructive reparative action, and that guilt-based emotional responses are more predictive of genuine behavioral change, whereas shame tends to produce defensiveness and denial rather

than accountability. *See* Tangney, Stuewig & Mashek, *Moral Emotions and Moral Behavior*, 58 Ann. Rev. Psychol. 345, 360-62 (2007).[9]

Rich's record reflects someone committed to reparative action.

### A. Acceptance of responsibility and performance of the disposition

Rich accepted responsibility and pleaded guilty to all three counts. He admitted the conduct and acknowledged the seriousness of the harm. He also performed every obligation associated with the coordinated federal-state disposition, forfeiting the required property, accepting the agreed sentence, and complying with the federal judgment.

With this request, Rich does not deny responsibility. He's only asking to account for his complete performance and the later failure of a term of the negotiated disposition.

### B. Disciplinary record

Rich has received only one minor disciplinary incident during nearly a decade in federal custody, a 331 series infraction for possessing tobacco in UNICOR. For this, he accepted responsibility, received the prescribed sanctions, and maintained clear conduct afterward. (*See* **Exhibit 12**, Chronological Disciplinary Record).

He has no instances of institutional violence, weapons possession, drug possession, escape activity, or continuing criminal conduct.

### C. Substance-abuse recovery

Rich entered federal custody after decades of addiction and the criminal conduct he used to justify it. In order to break free, he completed the forty-hour Drug Education Program, the 500-hour Non-Residential Drug Abuse Program (NRDAP), and additional substance-abuse programming. He developed an understanding of addiction, triggers, relapse patterns, accountability, support networks, and the daily practices required to maintain sobriety. Consequently, in an environment where illegal drugs and alcohol are prevalent,

---

[9] https://doi.org/10.1146/annurev.psych.56.091103.070145

he has maintained his sobriety and will continue treatment and peer support during and following completion of state custody.

### D. Employment and UNICOR achievement

Rich worked in UNICOR for nearly a decade. During that employment, he earned six separate 500-hour UNICOR completion recognitions, documenting at least 3,000 hours of sustained federal prison employment, which is recognized EBRR programming under the First Step Act. This reflects punctuality, reliability, productivity, cooperation, and the ability to function successfully in a structured professional environment.

Additionally, Rich trained new employees, helping them learn their assigned work and develop marketable skills that translate into high-income employment opportunities for them post release.

### E. Vocational and technical preparation

Rich obtained Microsoft Office certification and developed proficiency in Word, Excel, Visio, and PowerPoint. He also learned Adobe and Foxit PDF applications and obtained SAP business-software certifications.

The skills he's acquired are directly transferable to administrative, logistics, manufacturing, inventory, data-entry, and business-support positions. Many factors in society today hire at six-figure incomes applicants with the credentials and experience Rich now has. This gives him a hope and plan for his future he's never had before.

Currently Rich is enrolled in Legal Research and Real Estate courses, demonstrating continued intellectual development and preparation for lawful employment. And he is on the waiting list for ServSafe, which would add a recognized food-safety credential and broaden his employment opportunities.

### F. Financial and business education

Rich completed Marketing, Behind on Bills, Credit Repair, Building Your Savings, and Money Management. These programs address practical reentry risks, including debt, financial instability, credit management, lawful income, saving, budgeting, and responsible decision-making.

Rich now teaches Money Management to other incarcerated people. This transition from student to instructor demonstrates mastery, leadership, responsibility, communication skills, and a commitment to helping others avoid the financial instability that can contribute to recidivism.

### G. Health, education, and personal development

Rich has used his time to focus on whole rehabilitation and reentry preparation, investing in personal development in the areas of body, mind and spirit. He completed Talking With Your Doctor, an evidence-based program addressing communication with medical professionals. He also completed Dental Health, increasing his understanding of preventive care and long-term health maintenance.

Additionally, he completed American History, reflecting continued academic engagement and a broader understanding of civic and historical development. He completed basketball-officiating and spin classes, improving physical health while developing teamwork, leadership, responsibility, and discipline. And he completed the Threshold Program, which has helped expand spiritual development, reflection, accountability, community participation, and purpose.

In sum, all together these accomplishments demonstrate sustained development across recovery, employment, technical training, financial literacy, health, academics, spirituality, leadership, and service. (*See* **Exhibit 13**, Inmate Education Data Transcript, Program Review, & Certificates).

## VIII. THE §3553(A) FACTORS SUPPORT AN EIGHTEEN-MONTH REDUCTION

The Court must determine whether the requested reduction is warranted after considering the factors under 18 U.S.C. §3553(a). The original analysis remains important. Section 3582(c)(1)(A), however, requires consideration of the defendant's present circumstances and significant post-sentencing developments. *See United States v. Allen*, 956 F.3d 355, 358 (6th Cir. 2020) ("[C]ourts may consider post-sentencing conduct in assessing the §3553(a) factors when considering whether to adjust a previously imposed sentence." (citing *Pepper v. United States*, 562 U.S. 476, 487-93, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011))); USSG §1B1.10 cmt. n. 1(B)(iii) (providing that courts "may consider post-sentencing conduct of the defendant").

Rich has made a compelling showing that the balance differs today.

### A. The nature and circumstances of the offenses

Rich's methamphetamine-trafficking and firearm offenses are serious. His conduct endangered the community and justified substantial punishment. Nothing in this motion minimizes the seriousness of the offenses, shifts responsibility, or contends that rehabilitation erases the harm.

At sentencing on June 12, 2017, this Court already substantially weighed the nature and circumstances of Rich's offenses when it imposed the below-guideline 180-month concurrent term, reflecting a careful calibration of the punishment it determined was sufficient but not greater than necessary. The reduction for which Rich requests here simply will allow him to effectively serve between the fed's and the state the sentence handed down by this Court as intended.

### B. Rich's present history and characteristics

Rich entered custody as a person whose life was dominated by addiction, criminal thinking, selfishness, and disregard for the consequences to others. His present history includes more than ten years of recovery work, education, employment, technical certification, spiritual development, peer instruction, and nearly incident-free conduct.

Rich's record thus consists of more than a decade of observed behavior, revealing this term of incarceration has had its intended corrective effect.

### C. Seriousness, respect for law, and just punishment

During Rich's time in prison he has experienced the loss of liberty, separation from family, restricted autonomy, institutional discipline, overcrowding, and the ordinary deprivations of incarceration, the accepted consequences of his criminal actions. He has also experienced the additional restrictions arising from the detainer.

An eighteen-month reduction will not trivialize the offenses, but overall reflect the actual punishment handed down. If granted, Rich will remain federally incarcerated until approximately October 3, 2027, assuming no other computation changes, and will then transfer directly to Kentucky custody.

His respect for the law also includes respect for documented plea agreements and sentencing determinations. The criminal justice system demands exact performance from a defendant who pleads guilty

and forfeits property. The integrity of that system is strengthened when courts also account for a governmental promise that fails in operation after the defendant has fully performed.

**D. Deterrence**

The term Rich received and the just over a decade he has thus far served shows he's been effectively deterred. Rich has confronted the consequences of addiction, trafficking, firearm possession, and disregard for others. His programming, employment, sobriety, and overall conduct demonstrate that the deterrent message has been internalized.

The reduced sentence requested will continue to provide substantial deterrence. A defendant who serves a controlling 162-month federal term, finishes out time remaining on that term, transfers directly to state prison (finishing out the term amount equivalent to what remained on the federal term with this Court's concurrency order), and remains subject to five years of federal supervised release and any additional state supervision requirements, has received serious punishment.

**E. Protection of the public**

The requested reduction will not place Rich immediately in the community. He will remain in federal custody until the reduced term expires and will then transfer directly to Kentucky custody. His one minor disciplinary incident, recovery record, vocational preparation, employment opportunity, family support, and structured release plan, *infra*, further reduce risk.

**F. Treatment, education, and correctional needs**

Rich has taken extensive advantage of the programming available to him. He completed substance-abuse, vocational, financial, health, fitness, historical, spiritual, and personal-development courses. He obtained professional credentials, completed thousands of hours of UNICOR work, and became an instructor.

He remains enrolled in Legal Research and Real Estate and awaits ServSafe and other programming. The principal unmet need is trauma-focused treatment identified in his BOP Individualized Needs Plan. The detainer has prevented access because enrollment is prioritized according to proximity to release. (Exhibit 11).

Continued federal incarceration has not improved access to that treatment. The detainer has impeded it, by precluding Rich from prelease (halfway house) consideration; consequently, extending the custodial

portion of his term. The grant of this request's reduction will thus better position him for enrollment. But if for any reason Rich cannot complete an appropriate trauma-focused program before leaving BOP custody, he will enroll through the Kentucky Department of Corrections in Moral Reconation Therapy, including MRT Trauma,[10] which is offered at the state institution to which Rich will be assigned.[11]

### G. Kinds of sentences available

Section 3582(c)(1)(A) expressly authorizes reduction of an existing term when the statutory requirements are satisfied. The practical alternatives are not continued incarceration versus unrestricted freedom. They are completion of the full federal term followed by Kentucky incarceration (turning his total term into one of about 198 months), or an eighteen-month reduction followed by earlier transfer to the same Kentucky incarceration (resulting in the total term of 180 months).

### H. Applicable sentencing range

The original advisory Guidelines range was 262 to 327 months. PSR ¶ 95. The parties negotiated a 180-month sentence (82 to 147 months below that range) together with concurrency with the undischarged Kentucky term. The sentence's length and concurrent relationship were components of the same agreed disposition.

An eighteen-month reduction is warranted because the concurrency component has failed in operation and the resulting aggregate punishment exceeds the coordinated structure adopted at sentencing.

### I. Applicable policy statement

Rich proceeds under U.S.S.G. §1B1.13(b)(5). The qualifying circumstance is the post-sentencing failure of the coordinated concurrent-sentence arrangement and the resulting additional imprisonment, combined with years of documented detainer effects on the manner in which Rich has served the federal sentence.

Rehabilitation is considered under §1B1.13(d) only after that independent circumstance is established.

---

[10] MRT is a structured cognitive-behavioral program addressing responsibility, honesty, moral reasoning, decision-making, and goal setting. An MRT Trauma curriculum would provide a direct means of addressing the trauma-related need identified by the BOP while Rich completes the Kentucky sentence.

[11] The county jail in Henderson County, Kentucky

### J. Avoidance of unwarranted disparities

The principal disparity is between the sentence negotiated and imposed and the aggregate sentence now being executed. A 180-month federal sentence running concurrently with the remaining Kentucky term materially differs from a 180-month federal term followed by approximately eighteen additional months in state custody.

The requested reduction addresses this specific discrepancy while leaving Rich with a 162-month federal term, continued federal confinement, the remaining Kentucky obligation, and five years of federal supervised release.

### K. Restitution and financial obligations

The Court imposed no restitution and no fine. The only financial obligation imposed was the $300 special assessment, representing $100 for each count of conviction. Rich paid this assessment in full.

There is therefore no restitution interest, unpaid fine, or outstanding assessment that would be impaired by the requested reduction.

### L. The amount-of-time-served factor

The Sixth Circuit has ruled that courts may consider the amount of time a defendant has served when ruling on a motion for compassionate release. *See United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) ("[T]he need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the court to consider the amount of time served in determining whether a sentence modification is appropriate.")

Since his arrest on June 12, 2026, to August 18, 2026 (the date of this motion), Rich has served 10 years, 1 month, 26 days on his 180-month (15-year) term. A sentence of 15 years, minus total good credit time ("GCT") earned and projected equals a term of 153 months, 18 days (12 years, 9 months, 18 days). Since the BOP has not applied any of Rich's earned FTCs (First Step Act Time Credits) and the BOP categorically

denies prerelease placement to prisoners with detainers, thus accounting for the GCT alone, he has served just over 79% of his prison term, with 2 years, 7 months, 14 days remaining.[12]

If the Court grants this motion, (from the date of this filing) Rich will still have 1 year, 1 month, 14 days to serve on his federal term before being extradited to state custody.

## IX. RICH DOES NOT PRESENT A DANGER UNDER §3142(g)

U.S.S.G. §1B1.13(a)(2) requires the Court to determine that Rich is not a danger to another person or the community under 18 U.S.C. §3142(g).

Rich recognizes and accepts responsibility for the seriousness of his offenses, which involved methamphetamine trafficking and firearm possession while he was on state parole. These are actions for which he's greatly remorseful.

In the last decade, he's only had one minor disciplinary incident. He has no institutional violence, weapons possession, drug possession, escape activity, or continuing criminal conduct. Moreover, he's completed extensive recovery and recidivism-reduction programming, years of UNICOR employment, he's obtained professional certifications, trained coworkers, and became an instructor.

Importantly, as mentioned earlier, Rich will not be released directly into society. He will remain in federal custody until the reduced sentence expires and then transfer directly to Kentucky custody. He will remain incarcerated during resolution of the parole matter.

Upon eventual release, Rich will be subject to five years of federal supervised release and any applicable state supervision. As provided in his release plan, *infra*, his verified housing, employment, transportation, family support, recovery plan, and treatment resources provide additional structure.

The §3142(g) factors do not weigh against the requested reduction.

## X. RELEASE AND REENTRY PLAN

---

[12] Federal sentencing occurs within a statutory framework that contemplates not only confinement, but credit for good behavior (18 U.S.C. §3624(b)(1)) and reintegration (18 U.S.C. §3624(c)). Sentencing courts are aware that the term of imprisonment they impose will be carried out within this statutory structure. Regarding the reintegration factor, while a court does not control the specific placement decisions of the BOP, *see Tapia v. United States*, 564 U.S. 319, 331 (2011), the sentence is imposed against the backdrop of a system that includes a transitional phase. Where that transitional component is effectively unavailable, the actual execution of the sentence differs materially from the structure Congress contemplated and from the context in which the sentence was imposed.

### A. Continued federal incarceration and transfer to Kentucky

If the Court reduces the federal term by eighteen months, Rich will not be immediately released. Assuming no other change in the BOP computation, he will remain in federal custody until October of 2027. Upon expiration of the reduced term, Rich will transfer directly to the Kentucky Department of Corrections, pursuant to the parole-violation detainer. Kentucky will conduct the appropriate parole-revocation process and require he serve the remaining term reflected in its records.

This will resolve the state detainer, preserve state accountability, prevent immediate community release, conserve federal resources, and restore the concurrent sentencing as closely as presently possible.

### B. Trauma-focused programming in Kentucky custody

Rich will continue seeking the trauma-focused programming assigned by the BOP while he remains in federal custody. If, however, for any reason BOP placement in the program remains unavailable, Rich will enroll in appropriate Kentucky DOC programming at the Henderson County county jail, the facility where he will serve the remaining state term. That programming will include Moral Reconation Therapy (MRT Trauma), addressing trauma, responsibility, honesty, moral reasoning, decision-making, and goal setting. This alternative will allow Rich to satisfy the treatment need identified in his federal Individualized Needs Plan while completing the state obligation.

### C. Residence following state custody

After completing Kentucky custody, Rich will reside with his mother, Mary Rich, at 2511 Date Dr., Cocoa, FL 32926. For confirmation, she can be reached at 321-458-2931. (*See* **Exhibit 14**, Letter of Support). This represents a stable residence and provides family accountability and support during reentry.

### D. Employment and transportation

Rich has a vehicle and a confirmed employment opportunity available to him following his eventual return to society. (*See* **Exhibit 15**, Letter of Intent to Hire).

As backup, his UNICOR experience and certifications in SAP, Microsoft Office, Adobe, Foxit, document management, and business software, position him for lawful employment. Also, his ongoing legal

Research and Real Estate courses and anticipated ServSafe training further broaden his employment preparation and options.

### E. Recovery and community treatment

Rich will continue substance-abuse recovery and participate in community-based sobriety programming. He will avail himself of Operation New Hope's Space Coast services provided to those returning to society who are actively committed to their sobriety and life success. He will also regularly attend meetings via Space Coast Narcotics Anonymous, which provides peer-led twelve-step meetings and continuing recovery support. And he will reach out to and volunteer for Space Coast Recovery, which includes 1, 2, 3 Recovery and The Sober Pad and provides structured addiction-recovery and sober-living resources.

### F. Federal Supervision

Rich will comply with every condition of supervised release imposed by this Court. He will report as directed, participate in treatment and testing, maintain lawful employment, refrain from controlled substances and firearms, obtain permission for travel, and comply with all reporting obligations.

His family, employer, treatment providers, and supervising officer will form a structured accountability network.

## XI. CONCLUSION

**WHEREFORE**, for the foregoing reasons, Kyle William Rich respectfully requests that this Honorable Court reduce his controlling federal term from 180 months to 162 months pursuant to 18 U.S.C. §3582(c)(1)(A), leave the existing five-year term and conditions of supervised release unchanged, and direct that the amended release date be communicated promptly to the BOP, the United States Probation Office, and the Kentucky Department of Corrections, so that Rich may transfer to state custody upon expiration of the reduced federal term.

In the alternative, Rich respectfully requests appointment of counsel and an evidentiary hearing concerning the coordinated federal-state disposition, communications between the prosecuting authorities, the state charging and dismissal records, the forfeiture, the federal concurrency provision, the Kentucky detainer,

the remaining state sentence, the BOP's treatment of Rich's First Step Act credits, and the effect of those matters on the sentence Rich is now serving.

Respectfully submitted,

Kyle William Rich, pro se
Reg. No. 67559-018
FCI Coleman Low
PO Box 1031
Coleman, FL 33521-1031

Date: 8/19/2026

## CERTIFICATE OF SERVICE

I certify that on August 19, 2026, I placed a true and correct copy of this Motion for Reduction of Sentence in the institution's legal-mail system, properly addressed to:

AUSA Seth A. Hancock
U.S. Attorney Office – Paducah
501 Broadway
Paducah, KY 42001

/s/ ______________________
Kyle William Rich, *pro se*

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

Pursuant to Fed. Cir. R. 32, Form of Briefs, Appendices, and Other Papers, "A principal brief may exceed thirty (30) pages in length if it contains no more than 14,000 words…." Fed. Cir. R. 32(1)(b). This brief, in total, contains 10, 327 words (per Word Count dialogue box provided by Microsoft Office LTSC Professional Plus 2024).

/s/ ______________________
Kyle William Rich, *pro se*




9589 0710 5270 3790 0460 19

POUCH

UNITED STATES POSTAL SERVICE®

PM
COLEMAN, FL 33521
AUG 21, 2026

42301

$0.00

RDC 03 1 Lb 1.70 Oz S2324H505202-02

FROM:

KYLE RICH
REG. NO. 67559-018
FEDERAL CORRECTIONAL COMPLEX
COLEMAN LOW
PO BOX 1031
COLEMAN, FL. 33521

TO:

U.S. DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
423 FREDERICA ST., ROOM 126
OWENSBORO, KY 42301-3013

domestic and many international destinations.

s declaration form is required.

...ails regarding claims exclusions see the
Mail Manual at *http://pe.usps.com.*
ernational Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

AT RATE ENVELOPE
ATE ■ ANY WEIGHT

ACKED ■ INSURED

PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

how2recycle.info
PAPER POUCH

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.