# EXHIBIT 5

Request For Compassionate Release

9fes LSW 6/29/2

# REQUEST FOR COMPASSIONATE RELEASE

June 30, 2026

Warden Mendoza
Warden's Office
FCI Coleman Low

**RE**: Request for Compassionate Release, pursuant to 18 U.S.C. §3582(c)(1)(A), for Kyle W. Rich, Reg. No. 67559-018

Dear Warden Mendoza:

I am writing to request compassionate release pursuant to 18 U.S.C. §3582(c)(1)(A). The extraordinary and compelling circumstances supporting this request are set forth below, grounded in the legal framework of federal compassionate release doctrine, the documented effects of the pending parole violation detainer on my incarceration, and my substantial rehabilitation and post-sentencing conduct over nearly a decade in federal custody.

## I. APPLICABLE AUTHORITIES AND STATUTORY BASIS

### A. Extraordinary and Compelling Circumstances

An inmate may initiate a request for compassionate release only when there are particularly extraordinary and compelling circumstances. BOP Program Statement (PS) 5050.50, §571.61(a), incorporates this threshold by requiring "extraordinarily compelling circumstances" as a prerequisite for warden consideration. The standard is not meant to be prohibitively high.

An extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment. U.S.S.G. §1B1.13 Application Note 2. Specifically, the Sentencing Commission has made clear that the fact an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement. U.S.S.G. §1B1.13(c)(e) (as amended November 1, 2023).

Compassionate release is also made available to prisoners who show that their circumstances developed after sentencing in ways that were not contemplated at the time the court imposed the sentence. The developments in my case in the aggregate are precisely the sort of post-sentencing facts that compassionate release doctrine contemplates. These developments include both the detrimental effects of a pending VOP detainer, including its block of the court's intent to have my federal sentence run concurrently with the state sentence, and the substantial rehabilitation I have achieved.

### B. Minimum Requirements for Administrative Consideration

The BOP's administrative compassionate release process requires that the request contain the following information: (1) the extraordinary or compelling circumstances that warrant consideration; (2) a proposed release plan, including where I will reside and how I will support myself; and if the basis involves health, information on medical treatment and payment. BOP PS 5050.50, §571.61, Section 2(a). Since this request does not turn on health grounds, the former requirements control. As set forth below, I satisfy both, by providing detailed factual circumstances and a clear release plan.

### C. The "Other Reasons" Catchall and Rehabilitation

In 2023, the Commission revised §1B1.13 to better account for the plain language of §3582(c)(1)(A) and its legislative history. Relevant to this request, the policy retains the "Other Reasons" catchall ground currently found in the guidance. This ground makes clear that extraordinary and compelling reasons exist if a defendant presents any circumstances or combination of circumstances that, considered by themselves or together with other specified reasons, such as medical, age, family, or abuse-related grounds, are similar in gravity. U.S.S.G. §1B1.13(b)(5).

The Commission specifically rejected a requirement that "Other Reasons" be similar in nature to the enumerated categories. They need only be similar in gravity, a requirement that inheres in the statutory demand for "extraordinary and compelling reasons." 18 U.S.C. §3582(c)(1)(A); PS 5050.50, §571.61(a), Section 2.

Regarding rehabilitation: while 28 U.S.C. §994(t) provides that rehabilitation of the defendant alone is not, by itself, an extraordinary and compelling reason, the sentencing guidelines contemplate that rehabilitation may be considered in combination with other circumstances in determining whether a reduction is warranted. U.S.S.G. §1B1.13(d). This establishes that rehabilitation is a contextual factor that gains weight when coupled with extraordinary circumstances. In my case, the extraordinary circumstances arise from the detainer system's documented corrosive effects, and its prevention of the federal term running as handed down by the court, and my rehabilitation demonstrates that the detainer's effects have been channeled toward positive behavioral change rather than despair or deterioration.

### D. Post-Sentencing Conduct as a Factor

In further support of rehabilitation being a reviewable factor, post-sentencing conduct may be considered in determining whether a reduction in a defendant's term of imprisonment is warranted and the extent of such reduction. U.S.S.G. §1B1.10 App. n. 1(a)(B)(iii)(I)&(II). Moreover, courts have held that post-conviction rehabilitation is plainly relevant to the "history and characteristics of the defendant" under 18 U.S.C. §3553(a)(1). *Pepper v. United States*, 562 U.S. 476, 491 (2011). Just as a sentencing authority cannot artificially confine its analysis to the defendant's conduct at the time of the offense while disregarding subsequent developments, *Id.* at 488-89, neither should an administrative authority such as the Warden's office. What a just sentence looks like in light of who a defendant has become is precisely what post-sentencing analysis is designed to address.

## II. EXTRAORDINARY AND COMPELLING CIRCUMSTANCES: THE DETAINER EFFECT AND SENTENCING DISPARITY

### A. The Parole Violation Detainer and Its Corrosive Effects

My extraordinary circumstances arise from the confluence of two factors: (1) the pending Kentucky parole violation detainer that was issued following my federal sentencing; and (2) the fact that this detainer, combined with the status offense of being on parole when arrested for my federal charges, has effectively extended my federal term of imprisonment far beyond what any single offense would have warranted, creating a substantial sentencing disparity.

The Supreme Court, in *Carchman v. Nash*, 473 U.S. 716, 724-25 (1985), recognized the well-documented deleterious effects of detainers on incarcerated persons. Justice Brennan's Separate Opinion, joined by Justices Marshal and Stevens, outlined the corrosive consequences:

> A prison inmate with a detainer filed against him may suffer several disabilities, ranging from mandatory maximum-security classification to exclusion from vocational rehabilitation programs, loss of interest in institutional programming due to uncertainty about final release, and deprivation of meaningful pre-release preparation.

*Nash*, *id*.

The Court recognized three distinct objectives that underpin detainer resolution:

- First, definitive resolution of potential terms of incarceration so that prisoners can know with certainty when release is likely;
- Second, speedy disposition of frivolous detainers; and
- Third, reciprocal ease for signatory states to obtain persons in other jurisdictions. *Id*.

My case embodies precisely the harms the Supreme Court sought to curtail. I have suffered each of the disabilities Justice Brennan identified and the argument below outlines the specific, quantifiable impact on my federal term and my access to critical programming.

## B. Effects of the Detainer on My Federal Incarceration

### 1. Exclusion from Reentry Programming and Access to Earned Time Credits

The parole violation detainer has denied me access to programs specific to reentry preparation that require a definitive release date. Upon my intake, my "Individualized Needs Plan" identified that I require a psychology-based program addressing past trauma. (**Exhibit 1**, FSA Needs Reassessment). The BOP Psychology Department prioritizes enrollment according to proximity to pre-release. Because the detainer prevents the application of earned time credits for pre-release considerations, my projected pre-release date is artificially inflated. Consequently, here at Coleman Low I have been relegated to waiting-list status since February 2022, while similarly situated inmates without detainers have received preferential enrollment.

More significantly, the detainer has prevented the application of First Step Act (FSA) Time Credits (FTC) that I have earned under 18 U.S.C. §3632(d)(4)(A). These credits are earned through participation in evidence-based recidivism reduction (EBRR) programming and productive activities (PA). Prisoners determined to be at minimum or low risk who have not increased their risk of recidivism over two consecutive assessments earn an additional five days of time credits for every thirty days of participation. *Id*. §3632(d)(4)(A)(ii).

From December 21, 2018, to December 28, 2022, the FSA time credit assessment assessed me as a high-risk for recidivism. On December 28, 2022, I was reassessed to be a Medium risk, which, primarily due to the detainer, I stayed until June 15, 2025. At this time my recidivism-risk level was dropped to Low. (**Exhibit 2**, FSA Time Credit Assessment). But, due to the detainer, though I earn FTCs, they're not being applied. Though page 1 of the FSA Time Credit Assessment reflects that I've earned 365 FTC towards release and 505 FTC towards RRC/HC, page 4 of the Assessment shows neither earned release nor RRC

credits applied to my Conditional release date. (**Exhibit 3**, FSA Time Credit assessment, Pages 1 & 4). This equates to the BOP artificially classifying me still as a High or Medium risk for recidivism; though not in print, in effect, not based on my conduct or programming, but specifically to avoid applying earned time credits because of the detainer. Under 18 U.S.C. §3632(d)(4)(A), the BOP is statutorily required to apply time credits to all eligible prisoners with detainers, with the sole exception being deportable aliens with an immigration detainer and a final order of deportation, an exception with zero application to my circumstances. Nevertheless, the BOP is circumventing its statutory obligations. While I qualify for and have earned the additional time credits, they're not being applied. Further, the detainer's role in elevating my recidivism-risk category directly contributed to me earning only ten days of time credits for every thirty days served, rather than the fifteen days I would earn at Low risk.

Since December 2018, when the FTC program commenced, I have earned 120 days per year (four months annually). If not for the detainer, I would have earned 180 days per year (six months annually) beginning in 2019, after my first two assessment periods. This difference equates to two additional months per year (counting 2019) spent in prison that would otherwise have been in transitional custody (halfway house or home confinement). Over the eight years since December 2019, this totals 16 months, a full year and four months of incarceration that should have been served in the community.

Under BOP PS 5410.01(10)(c)(iii), earned time credits cannot be applied to an inmate with an unresolved detainer. Since December 2018 (to the date of this request), I have earned a total 960 days of time credits (32 months, or 2 years, 7 months, and 20 days). When this is combined with the five additional days per thirty days that I am not receiving (which is lost forever), the detainer has kept me incarcerated for 3 years, 11 months, and 15 days longer than I would have served without it.

Accounting for good time credit, my current Projected Release Date is April 3, 2029. If the detainer were resolved immediately and my earned FTC applied, my conditional pre-release date would advance to May 2025, about 11 months ago. This application would immediately qualify me for immediate release to the state detainer. Then I would receive the balance of my violation of parole (VOP) sentence of 18 months in Kentucky state prison.[1] And there I would also be able to enroll in an equivalent trauma-based psychology program as one required to meet my federal NEEDS assessment, thus bypassing the waiting-list logjam.

Additionally, if my earned FTCs were correctly applied from the beginning (as statutorily directed by the FSA, pursuant to 18 U.S.C. §3621(e)(2)(B)), I would have also qualified for and been able to avail myself of the Residential Drug Abuse Program (RDAP), its completion earning me an additional year off my prison term.

Also, my unit Case Manager, Mr. Felton, has communicated directly to me that without the detainer, I would qualify for a year's worth of Residential Reentry Center (RRC, or halfway house) placement under the Second Chance Act (SCA), which would be pursuant to 18 U.S.C. §3624(c)(1).[2] The Bureau is statutorily required to ensure that prisoners spend a portion of their final months under conditions affording reasonable opportunity to adjust to and prepare for reentry. *Id.* The Director of the BOP is required to issue regulations ensuring that community correctional facility placement is "of sufficient duration to provide the greatest likelihood of successful reintegration into the community." *Id.* §3624(c)(6)(C).

---

[1] If nothing else changes, September of this year (2026) I will have 18 months remaining on my federal term.

[2] Mr. Felton said this despite the current "FSA Time Credit Assessment" sheet currently stating only 182 (or about 6 months) of recommended "SCA Max. Statutory HC Placement Days," as this and the Assessment's "N/A" designation for "SCA Recommended Placement Days" are only placeholders resulting from the detainer.

Calculating everything, without the detainer, in addition to the lost FTCs, when I further account for the 1-year sentence reduction for completing RDAP and 1-year of RRC time, my pre-release date would have occurred in May of 2023, over three years ago. But now, in order for me to receive "sufficient duration" in a halfway house "to provide the greatest likelihood of successful reintegration into the community," I have to be released to a state halfway house from state prison as part of completing the remainder of my pending state term. This can be accomplished by reducing my federal term to time served so that I can be released directly to my VOP detainer.

### 2. Higher Security Classification and Heightened Custody Restrictions

The detainer has also resulted in my higher security classification. Under BOP policy, detainers are scored on the Inmate Load and Security Designation Form, and the scoring may differ from the score on the Custody Classification form. "When there is a pending charge involving a probation or parole violation, points based on documented behavior are assigned using the most severe documented behavior from the original offense as the basis for assignment." BOP PS 5100.08.

My detainer is categorized as a parole violation charge, and consequently it is scored against me, elevating my base-custody security classification. My unit team has advised me that without the detainer, they could lower my custody score and transfer me to Camp custody. As it stands, I have spent my federal term at medium and low security facilities when, absent the detainer, I would have long ago been transferred to Camp custody and then to transitional housing. The detainer has therefore not only extended my time in prison but has made that extended time more restrictive and punitive.

Additionally, Coleman Low was designed to hold 1,536 inmates, but one of twelve units has been closed due to black mold and construction problems, reducing its rated capacity to 1,408. Yet the facility, in its 11 units, houses nearly 1,800 inmates. BOP policy provides that cubicles of 120 square feet or less may be occupied by no more than two inmates. BOP PS 1060.11. This facility violates this policy systematically, housing three persons in 36 (or 56%) of the total 64 cubicles in each unit, cubicles that fall below 120 square feet.

In other words, units designed to hold 128, instead house over 160 inmates each. Consequently, I have spent years in conditions substantially more overcrowded than policy permits, with the detainer being a primary contributing factor to my inability to transfer to a Camp-custody facility where conditions are substantially less harsh.

## C. Sentencing Disparity Created by Parole Status and Enhancement Points

My extraordinary circumstances extend beyond the programmatic and custodial effects of the detainer. The underlying parole violation itself, combined with my status as a parolee at the time of my federal arrest, directly resulted in my federal sentence being substantially longer than it would have been absent those factors.

At sentencing in federal court, the Presentence Investigation Report (PSR) enhanced my sentencing guidelines by two points, specifically because I was on parole in Kentucky at the time I committed my federal offense. (PSR, pg. 23, ¶ 61). My underlying state cases from which I was paroled involved an additional seven sentencing enhancement points: three points for the 2004 marijuana trafficking charge; one point for the 2004 suspended license charge; and three points for the 2009 methamphetamine charge. Though seven points were assessed, only six points were counted for federal guideline purposes.

In aggregate, I received eight sentence-enhancing points attributable to my parole status and the underlying charges that generated that parole. These eight points were instrumental in my criminal history category being increased to Category VI, the primary charge for which being one of the charges used for the career offender enhancement. Removing the 8 points results in a reduction of 52 months (4 years and 4 months) on the minimum end, and a reduction of 65 months (5 years and 5 months) on the maximum end.

I am serving 180 months (15 years) in federal prison. The above means that four to five years of that term are directly attributable to the fact that I was on parole when I committed the federal crime and to the pre-existing state sentences that generated that parole. Under Kentucky law, the maximum I would face for a parole violation is substantially less. According to the Kentucky Parole Board and DOC records, I owe Kentucky approximately 18 months of incarceration to resolve my parole violation and satisfy my original state sentences.

This creates a fundamental disparity: Four-to-five years for a state violation and status offense (being on parole) that, under state law, warrants no more than 18 months of incarceration, represents me being in prison custody about 2.75 to 3.25 times longer than the parole violation itself would justify.

This disparity is further expounded by the primary triggering case has been ongoing since I was 18-years old, when I was arrested for it on August 19, 2004. This means that for an arrest and conviction for "8 ounces, but less than 5 pounds" of marijuana, I've been in some form of prison, on probation, or under threat of continued incarceration for nearly 22 years. (PSR, pg. 16, ¶ 50)

This disparity is compounded further by the fact that federal law itself has recognized the disproportionate impact of purity-based methamphetamine sentencing guidelines, which further enhanced my offense level beyond what current law would support.

### D. Methamphetamine Purity Sentencing and Changes in Law

The federal sentencing guidelines impose disproportionately harsh penalties based on the purity of methamphetamine, treating purity as a proxy for a defendant's culpability in the drug distribution chain. However, empirical evidence demonstrates that this assumption is no longer valid.

When Congress established separate statutory penalties for pure methamphetamine versus methamphetamine mixture in the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, §6470(g)-(h), 102 Stat. 4181, 4378, the average purity of methamphetamine trafficked in the United States was seldom greater than fifty percent. At that time, individuals trafficking highly pure methamphetamine were reasonably assumed to occupy a higher position in the drug distribution chain and thus to carry greater culpability. Since then, the purity of methamphetamine trafficked in the United States has increased substantially. Current data from the United States Sentencing Commission (Commission) shows that methamphetamine tested in fiscal year 2022 was on average over ninety-percent pure (93.2%), with a median purity of ninety-eight percent. This uniformly high purity holds regardless of whether the methamphetamine is sentenced as mixture, actual, or ice. *See* U.S. Sentencing Commission, Methamphetamine Trafficking Offenses in the Federal Criminal Justice System 3 (2024).

The Commission's comprehensive analysis further demonstrates that there are no statistically significant differences in the purity of methamphetamine based on the function of the individual drug trafficker. High-level suppliers had drugs averaging 95.2% pure: mid-level organization employees had methamphetamine averaging 93.3% pure. The rates did not vary substantially by function, save for

couriers. The Commission explicitly concluded that purity is no longer an accurate proxy for an offender's role in the distribution chain.

Courts across multiple circuits have recognized this reality and expressed policy disagreements with the harsh treatment of pure methamphetamine under the guidelines. *See United States v. Nawanna*, 321 F. Supp. 3d 943, 2018 U.S. Dist. LEXIS 72676 (N.D. Iowa May 1, 2018); *United States v. Gutierrez*, 827 Fed. Appx. 619; 2020 U.S. App. LEXIS 34129 (8th Cir. Oct. 29, 2020) (citing other cases); *United States v. Havel*, 2023 U.S. Dist. LEXIS 22683 (D. Neb., Feb. 10, 2023) (court finding that "the 10-to-1 ratio treating 1 gram of methamphetamine (actual) as the equivalent of 10 grams of methamphetamine mixture, see §2D1.1(c)(1)-(12), generally results in sentencing calculations inconsistent with §3553(a)," citing a collection of supporting cases). *See also United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255-56 (D.N.M. 2017) (treating the defendant's 98.1% pure methamphetamine as a mixture because "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality").

The methamphetamine offense for which I was charged occurred in 2016, a time when these sentencing assumptions, though empirically unfounded, still wielded considerable influence. My sentence reflects those inherent assumptions, me being held responsible for 1,360.8 grams of a mixture of methamphetamine. (PSR, pg. 7, ¶¶ 20 & 25, and Addendum to the Presentence Report). The Commission's 2024 report confirms that purity is no longer a meaningful indicator of culpability, and courts are expressing growing policy disagreement with the harsh penalties. This evolution in judicial and empirical understanding constitutes a significant post-sentencing development that bears on whether my sentence, as originally imposed, continues to serve the purposes of sentencing under 18 U.S.C. §3553(a).

## III. SECTION 3553(a) SENTENCING FACTORS

### A. The Nature and Circumstances of the Offense

The nature and circumstances of my offenses are factually fixed and do not change through the passage of time. I was convicted of conspiracy to knowingly and intentionally possess with intent to distribute methamphetamine, knowingly and intentionally possessing with intent to distribute methamphetamine, and felon in possession of a firearm. These are serious federal crimes. As I did following my arrest, I take full responsibility for my actions and the harm they caused, something for which I am deeply remorseful. (PSR, pg. 9, ⁋⁋ 39 & 40).

The sentencing factors applicable to these offenses must be understood in light of the post-sentencing developments I have outlined earlier, and will further outline below. The nature of my conduct is static, but the context in which it was sentenced (the parole status enhancement, the purity-based guidelines that now appear empirically unsound, and the detrimental effects of the pending parole violation detainer) have all shifted since June 2017. While I cannot alter what I did, the justice system can account for what has happened since and for the person I have become.

### B. History and Characteristics of the Defendant

The history and characteristics of the defendant is the factor that is dynamic. It develops continuously throughout incarceration, and it is precisely this factor that compassionate release doctrine is designed to account for. The Fourth Circuit has held that when considering §3553(a) factors, courts must account not only for circumstances at the time of the original offense but also for significant post-sentencing

developments, including rehabilitation efforts. *United States v. Smith*, No. 22-7283, 2023 U.S. App. LEXIS 30413, 2023 WL 7688370, at *2 (4th Cir. Nov. 15, 2023).

The Fourth Circuit further held that §3582(c)(1) necessarily envisions that the §3553(a) factors may balance differently upon a motion for compassionate release than they did at initial sentencing. *United States v. Kibble*, 992 F.3d 326, 335 (4th Cir. 2021). If a court's original §3553(a) analysis could always foreclose a sentence reduction, §3582(c)(1) would be rendered a nullity. When considering the §3553(a) factors, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments," such as the defendant's rehabilitation efforts. *United States v. Mangarella*, 57 F.4th 197, 203 (4th Cir. 2023). The court's "task in weighing compassionate release [is] not to assess the correctness of the original sentence it imposed." *United States v. Bond*, 56 F.4th 381, 385 (4th Cir. 2023), cert. denied, 143 S. Ct. 2596 (2023) (internal quotation marks omitted). Rather, courts are asked "to balance the severity of the inmate's personal circumstances, on the one hand, against the needs for incarceration, on the other, ... to determine whether [the] relevant §3553(a) factors weigh against sentence reduction in light of new extraordinary and compelling reasons." *United States v. Malone*, 57 F.4th 167, 176 (4th Cir. 2023) (cleaned up). This principle applies with equal force to a Warden's analysis under the administrative compassionate release framework.

My history and characteristics have fundamentally evolved during my incarceration. Upon arrival to federal custody in 2016, I was an individual struggling with decades-long drug addiction and the criminal patterns that addiction had driven. Over nearly ten years in federal custody, I have transformed that struggle into sustained recovery and productive engagement.

My disciplinary record reflects this transformation. I have received only a single incident report for a minor infraction during my time in federal custody. I accepted responsibility for that infraction, was appropriately sanctioned, and have maintained exemplary behavior since. (**Exhibit 4**, Chronological Disciplinary Record). This record stands in stark contrast to the criminal conduct that preceded my incarceration.

More importantly, I have engaged proactively in numerous rehabilitation and reentry programming that has equipped me with skills and knowledge essential for successful reintegration. I have completed the following rehabilitation and programming:

- Sports and Fitness: I completed the Officials Basketball Class, which improved my physical fitness while developing teamwork, leadership, and responsibility skills through officiating. I also completed a Spin Class to enhance cardiovascular health and overall well-being.
- Health and Wellness: I completed "Talking With Your Doctor," a program teaching critical communication skills for discussing health issues with medical professionals.
- Financial and Business Education: I completed Marketing, gaining knowledge of product promotion and business development. I completed "Behind on Bills," learning strategies for managing and reducing debt. I completed "Credit Repair," developing skills to improve credit scores and manage credit responsibly. I completed "Building your Savings," gaining insight into saving strategies and financial responsibility. Most significantly, I completed "Money Management," and I now teach this course to other inmates, helping them develop habits of successful living. This transition from student to instructor demonstrates both my commitment to the material and my capacity for positive peer leadership.
- Substance Abuse and Recovery Programming: I completed the 40-hour Drug Education Program, increasing my awareness of the dangers of drug abuse and the importance of maintaining sobriety. I completed the 500-hour Non-Residential Drug Awareness Program (NRDAP), continuing my education on drug abuse prevention and coping mechanisms, and learning to

establish support and accountability networks for active maintenance of sobriety and successful living. I completed the Drug Abuse Program, developing a deeper understanding of addiction and effective methods for maintaining long-term recovery.

- Spiritual and Personal Development: I completed the Threshold Program, engaging in spiritual growth and personal reflection, fostering a sense of purpose, community responsibility, and inner peace.
- Employment and Vocational Training: I worked in UNICOR factory employment for nearly seven years, gaining valuable work experience and professional skills. During this employment, I obtained Microsoft Office Certification, becoming proficient in Word, Excel, Visio, and PowerPoint. I mastered Adobe and FoxIt PDF applications, essential for document management. I obtained SAP Business Software Certifications, learning high-demand business software that makes me a valuable asset in any modern job market. I trained new hires, demonstrating leadership and mentorship skills and helping them succeed and acquire skills for positive societal contribution.

(**Exhibit 5**, Program Review and Certificates).

I am currently on waiting lists for Criminal Thinking, Anger Management, and Academic Success, programs designed specifically for inmates approaching release. I have been waiting since February 2022 for these opportunities, unable to access them due to the artificial pre-release date created by the parole violation detainer. My documented readiness and eagerness to engage in these programs demonstrates my continued commitment to rehabilitation, even as the detainer prevents me from accessing the final critical programming before reentry.

### C. Recidivism Risk Assessment

The BOP's own validated assessment tools confirm that I present a substantially reduced risk to the community. Under the FSA, my recidivism assessment is the PATTERN instrument, a validated actuarial tool developed specifically to measure the probability that an inmate will reoffend following release. My PATTERN score classifies me as Low risk for recidivism. (Exhibit 2). This classification is among the strongest objective indicators available that release does not present a danger to the community.

This Low-risk classification is particularly significant because it reflects my programming, my conduct, my engagement in evidence-based recidivism reduction activities, and my overall behavioral transformation. The BOP's own empirical assessment divorced from any discretionary judgment indicates that I am not a danger upon release.

### D. Sentencing Disparity and Proportionality

A significant post-sentencing development is the recognition of unwarranted sentencing disparities. Section 3553(a) requires the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6).

I am serving four to five additional years in federal prison (approximately seventy-two months); specifically, because I was on parole in Kentucky when I committed my federal offense, and because of the underlying state sentences that generated that parole. In Kentucky I face a maximum sentence 18 months for the violation itself. The disparity is extraordinary.

Furthermore, my methamphetamine-related sentence enhancements were calculated under guidelines that the Commission has now documented as empirically unsound. The purity of methamphetamine is no longer a reliable proxy for culpability, and courts are expressing growing policy disagreement with the harsh treatment of purity-based cases. My sentence reflects sentencing assumptions that have been substantially undermined by empirical research conducted after my sentencing.

### E. Adequacy of Deterrence and Punishment

I have been incarcerated for just over 10 years. I am now 42-years old. Deservedly, I have experienced the full weight of federal incarceration (the extended loss of freedom, the separation from my family, the constraints on my autonomy, the deprivation inherent in carceral confinement). I have confronted the consequences of my actions, experienced genuine remorse, and undertaken a sustained effort to turn remorse into action and transform myself into a person who contributes positively to society rather than harming it.

The purposes of sentencing under §3553(a) (retribution, deterrence, rehabilitation, and incapacitation) have been substantially satisfied by the time I have already served. I am no longer the person I was when arrested in 2016. I have been deterred. I have been rehabilitated. I present no danger to the community. Continued incarceration serves no legitimate penological purpose and becomes merely punitive in character.

### F. Corrective Justice and the Federal Concurrent Sentence

A critical aspect of the sentencing disparity in my case relates to the federal court's original sentencing judgment. At sentencing, the federal judge ordered my federal term to run concurrently with any state sentence I might receive. This reflected the judge's intent that my total punishment be bounded by the federal term, not extended beyond it.

The state of Kentucky, through its Department of Corrections, offered me a deal: if I forfeited money and a vehicle, the state would not bring new charges and would allow any sentence to run concurrent with my federal term. (PSR, pg. 5, ¶ 12). I complied with this agreement, forfeiting the assets as promised. However, the state subsequently reneged on this understanding. Instead of bringing me back for sentencing in a manner that would allow concurrent sentences or absorption of the violation into existing parole status, the state issued a parole violation detainer and has allowed it to remain unresolved for over eight years. In that timeframe Kentucky has revised its governing statute (439.344), dictating that I must return to prison and, pursuant to KRS 533.060, the time must be ran consecutively. (**Exhibit 6**, Letter From DOC).

This action by the state, coupled with the BOP's accommodation of the detainer through inflated security designations, has effectively converted what the federal judge intended to be a concurrent sentence into a consecutive one. The federal court's sentencing judgment that my punishment be bounded by my federal term has been thwarted. Reducing my federal sentence to time served, releasing me to serve the final 18 months of my federal term in state custody, while resolving the detainer, would together restore the concurrency that the federal judge originally envisioned.

## IV. SECTION 3142(g) FACTORS: DANGER ASSESSMENT

### A. No Danger to Community Upon Release to State Custody

Under §3142(g), I must demonstrate that I "am not a danger to the safety of any other person or to the community." 18 U.S.C. §3142(g). However, my case presents a unique circumstance: I am not requesting release to society at large. I am requesting that my federal sentence be reduced to time served so that I may be released to the Kentucky Department of Corrections to serve the remainder of my time in state custody as a parolee.

In other words, I will not be released to community supervision or to unrestricted freedom. I will be transferred to state custody where I will serve approximately eighteen months of a state prison term to resolve my parole violation. The danger assessment becomes largely moot when the person is being transferred from one carceral system to another, rather than being released to the community. Nevertheless, for the sake of completeness, I address the §3142(g) factors below.

### B. Substantial Behavior Change and Transformation

I am substantially different from who I was at the time of my arrest and original sentencing. Incarceration has had its intended corrective effect. From the outset of my federal incarceration, I engaged in sustained, documented rehabilitative conduct, reflecting genuine accountability and a fundamental change in values and conduct.

My conduct record, considered as a whole, demonstrates that I no longer present a danger to any person or the community. I have spent over 10 years in federal custody with only one minor infraction. My programming participation is exemplary. My relationships with staff and inmates are positive. My engagement with educational and vocational training is consistent and productive.

I came to federal custody as someone whose life had been dominated by drug addiction and the criminal activity addiction generated. I began incarceration with little understanding of why my life had spiraled so completely. Over the course of my incarceration, I have developed genuine insight into the trajectory of my addiction, the harm I caused to others, and the steps necessary to maintain long-term recovery.

This transformation reflects years of consistent engagement with substance abuse programming, spiritual development, education, and vocational training. It reflects a deliberate choice, made daily and over years, to invest in recovery and in becoming the kind of person who contributes positively to society rather than harming it.

### C. Programming and Risk Reduction

The risk that I will reoffend is further substantially reduced by the scope of programming I have completed during incarceration. The majority of my completed programs are Evidence-Based Recidivism Reduction programs designated under the FSA. Research consistently supports the conclusion that participation in EBRR programs meaningfully reduces the probability of reoffending. Empirical research has established that educational programming in particular reduces recidivism, and meta-analyses have reinforced this finding. *See* Lyman et al., Educating Prisoners: New Meta-Analysis Reinforces It Reduces Recidivism, Prison Legal News (Apr. 1, 2023), available at https://www.prisonlegalnews.org/news/2023/apr/1/educating-prisoners-new-meta-analysis-reinforces-it-reduces-recidivism/.

I have not merely passively participated in these programs; I have excelled in them. I now teach Money Management, sharing what I have learned with other inmates and demonstrating my capacity for

leadership and peer education. I have obtained professional certifications in SAP business software, Microsoft Office applications, and PDF document management skills that position me for meaningful employment upon release.

None of the above-listed factors support a conclusion that I present a danger under §3142(g).

## V. SUMMATION: REHABILITATION RECORD AND REENTRY PREPARATION

My rehabilitative accomplishments during incarceration are extensive and demonstrate not only my capacity for change but my commitment to sustained effort over years to develop skills, knowledge, and character. They provide additional objective evidence that I am no longer the person who committed the crimes for which I am incarcerated, and that I am prepared for successful reintegration.

My disciplinary record is exemplary. I have received only a single incident report in nearly a decade of incarceration, far below the facility average and vastly lower than would be expected for someone lacking genuine commitment to behavioral change.

My programming completion spans multiple areas: substance abuse recovery and education, financial management and business education, health and wellness, employment and vocational training, and spiritual development. I have not merely completed programs; I have excelled in them. I have transitioned from participant to instructor, now teaching other inmates. And I have obtained professional certifications in high-demand software and office applications.

My work history in UNICOR reflects seven years of consistent employment, responsibility, and skill development. I have demonstrated capacity for technical learning, interpersonal cooperation, and productive contribution.

I have maintained clear sobriety and have built the knowledge, skills, and support networks necessary to sustain long-term recovery. I understand the nature of addiction, the triggers that drove my behavior, and the strategies necessary for maintaining sobriety.

## VI. RELEASE PLAN

If my request for compassionate release is granted and my federal sentence is reduced to time served, I will be transferred to the Kentucky Department of Corrections to serve the remainder of my state parole violation sentence, approximately eighteen months of incarceration. This arrangement accomplishes several critical objectives.

First, it fully satisfies the state's obligation to address my parole violation. The state parole board has indicated that they will pursue this matter once my federal term is completed. By returning me immediately to state custody for time served on my original state sentences, I will complete the state's requirements while freeing federal resources and BOP bed space.

Second, it ensures that I remain under carceral supervision during the final portion of my sentences, eliminating any risk assessment concerns.

Third, it allows me to complete my final state obligation in an environment where I can continue engagement with educational and programming opportunities, leveraging the momentum of my federal rehabilitation efforts.

Fourth, upon completion of my state sentence and resolution of my parole status, I will be better positioned for successful reentry.

(i) Where I Will Reside:

I will reside with my mother, Mary Rich, at 2511 Date Dr., Coca, FL 32926. To confirm, she can be reached at 321-458-2931. (**Exhibit 7**, Letter of Support).

(ii) How I Will Support Myself:

I have a car and job waiting for me on my release. (**Exhibit 8**, Letter of Intent to Hire).

Also, I will have maintained my sobriety, continued my engagement with recovery principles, and accessed additional state programming to reinforce my federal efforts. To build on this, I will continue my support-network building efforts and participate in community-based sobriety programming. To do so, in my release area I will connect with:

- Operation New Hope (Space Coast Site): Offers pre- and post-release reentry services, including job coaching, life skills training, housing, and mental health support for justice-impacted individuals. They also provide narcotics Anonymous (NA) 12-step meetings in and around Cocoa.
- Space Coast NA – Space Coast Recovery/ 1, 2, 3 Recovery: Offers transitional support and operates a residential addiction recovery program.
- Space Coast Recovery – The Sober Pad: Operates FARR-certified men's sober living houses in the immediate area with an emphasis on 12-step work and peer recovery coaching.

In sum, I am disciplined, educated, and skilled in multiple professional areas. I have legitimate employment prospects given my SAP and Microsoft Office certifications, with a job already lined up. I have a network of support for maintaining sobriety. I have demonstrated for over 10 years that I can live responsibly in a structured environment and maintain positive relationships with authority and peers.

## VII. CONCLUSION

In conclusion, considering all of the above, the extraordinary and compelling circumstances in my case are substantial. The pending Kentucky VOP detainer has created measurable, quantifiable harms: it has prevented the sentence to be served concurrently with the state sentence, as handed down by the court, it has extended my federal sentence by years, it has prevented application of earned time credits, it has restricted my access to critical reentry programming and a year off of my sentence by preventing my qualification for such from the RDAP program, and it has prevented me from receiving a year's worth of SCA halfway house placement. Together, over a decade's worth of extra time served in a custodial setting that I would not serve if I did not have the detainer. This represents over six times the amount of time I would face in the state of Kentucky for the violation of parole, time that I still have to serve following the completion of my federal term.

Additionally, the detainer has elevated my security classification beyond what my conduct warrants, and subjected me to overcrowded facility conditions.

My post-sentencing conduct has been exemplary. I have engaged in sustained rehabilitation across multiple domains. I have earned professional certifications. I have demonstrated leadership by teaching

others. I have maintained disciplinary excellence. I have been assessed at Low risk for recidivism. Taken together, I am substantially different from the person I was when arrested.

The §3553(a) sentencing factors, properly analyzed in light of post-sentencing developments, support a reduction of my federal sentence to time served. The detrimental effects of the parole violation detainer, the sentencing disparity created by parole status enhancements and credit-earned denials, the changes in sentencing doctrine regarding methamphetamine purity, and my substantial rehabilitation all point toward a conclusion that my continued federal incarceration no longer serves a legitimate penological purpose, that purpose having already been achieved multiple times over.

I am requesting that my federal sentence be reduced to time served, which will allow me to be released to Kentucky Department of Corrections custody to complete my parole violation resolution in state prison. The granting of this request will respect the federal court's original intent that my sentences run concurrently, will resolve the state matter, will eliminate any risk concerns that anyone may have with releasing me "early (via continued carceral supervision), and will allow me the opportunity to complete my rehabilitation in an environment where I can maintain my recovery momentum and prepare for eventual successful reintegration.

Respectfully submitted,

Kyle W. Rich
Reg. No. 67559-01